## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

P.N.,

           Plaintiff,

    v.

THE ESTATE OF DR. REGINALD
ARCHIBALD; THE ROCKEFELLER
INSTITUTE, a.k.a. THE
ROCKEFELLER UNIVERSITY, a.k.a.
THE ROCKEFELLER UNIVERSITY
HOSPITAL,

           Defendants.

No.

JURY TRIAL DEMANDED

## ORIGINAL COMPLAINT

Plaintiff, P.N., files this Complaint against The Estate of Dr. Reginald Archibald ("The Estate") and The Rockefeller Institute, a.k.a. The Rockefeller University, a.k.a. The Rockefeller University Hospital ("Rockefeller"), and alleges as follows:

**I.   INTRODUCTION**

1.     This is a civil action to recover damages for sexual abuse perpetrated by Dr. Reginald Archibald ("Archibald"), an employee of Defendant Rockefeller for more than 40 years, and more recently damages caused by the transmission and receipt of a highly offensive, and extreme and outrageous correspondence directed at

Plaintiff for no purpose other than to benefit the entity that for four decades employed the perpetrator.

2.     Beginning in the 1940s through the late 1980s, Archibald was employed as a pediatric endocrinologist at Rockefeller.

3.     By its own account, Defendant Rockefeller has been a preeminent research facility, with an international reputation for excellence since its opening in 1910.

4.     Over his career, Archibald had more than 9,000 patients, many of whom were boys who were small for their age, and who for various reasons were unable to grow to what medical professionals consider a "normal" size.

5.     Throughout his career, Archibald molested and sexually abused hundreds of patients. He did so using his office and examination rooms at Defendant Rockefeller's facilities. Archibald also took nude and pornographic photos of his victims and kept them at Rockefeller's facility. Upon information and belief, Rockefeller staff members were aware of the photographs and his conduct for many years, and remained silent regarding the photographs and abusive conduct.

6.     Archibald stole something innocent, and sensitive, and sacred from every child he abused.

7.     Defendant Rockefeller investigated and found credible allegations of

sexual abuse by Archibald at the latest in 2004, when Archibald was still living.

8.      However, at least as early as 1960, Rockefeller's President was made aware of a grand jury investigation of Archibald's sexually abusive conduct.

9.      Archibald died in 2007.

10.      Recently, in anticipation of litigation following what it knew was the likely passage of the Child Victims Act, S2440, Defendant Rockefeller re-engaged a law firm, Debevoise & Plimpton LLP, to investigate and reach out to individuals who were likely abused by Archibald, and who were of course potential plaintiffs.

11.      As a part of its investigation and attempt to mitigate its liability, Defendant Rockefeller mailed a correspondence ("Letter") to at least 1,000 former patients of Archibald. The Letter indicated that Rockefeller believed the recipient may have been the victim of inappropriate conduct by Archibald and included contact information for a lawyer and law firm—although the Letter did not identify them as such, nor did the Letter inform the recipients what uses their information would be put to.

12.      Predictably, the Letter reopened wounds and re-traumatized Archibald's victims, causing severe emotional distress and invading their privacy.

## II.   JURISDICTION AND VENUE

13.      This Court has subject matter jurisdiction over Plaintiff's claims

3

pursuant to 28 U.S.C. § 1332(a) because complete diversity exists among the parties and the amount in controversy exceeds $75,000.

14.    This Court has personal jurisdiction over Defendant Rockefeller because it is a citizen of the State of New York, and the acts that form the basis for this Complaint occurred, in substantial part, in the State of New York.

15.    Venue is proper in this District under 28 U.S.C. § 1391(b) and (c) because Defendant resides in this District and a substantial part of the acts or omissions that give rise to this action occurred in this District.

16.    This Court has personal jurisdiction over Defendant Estate because the acts that form the basis for this Complaint occurred, in substantial part, in the State of New York.

## III.    PARTIES

17.    Plaintiff P.N. is a citizen and resident of the State of Colorado.

18.    Defendant Estate of Reginald Archibald was probated in the State of Minnesota. Archibald was a pediatric endocrinologist who spent the overwhelming majority of his career as a hospital-based physician at Rockefeller. Archibald was a lifelong resident of Pelham, New York, and he died in 2007.

19.    Defendant The Rockefeller Institute is located at 1230 York Ave., New York, New York 10065.

20.   Defendant The Rockefeller Institute is a domestic not-for-profit corporation formed under and governed by the laws of the State of New York.

21.   Defendant The Rockefeller Institute also goes by the name The Rockefeller University.

22.   Defendant The Rockefeller Institute also goes by the name The Rockefeller University Hospital.

23.   The Rockefeller University Hospital is located at 1230 York Ave., New York, New York 10065.

24.   The Rockefeller University Hospital is a division of The Rockefeller University. It operates under the charter of Defendant Rockefeller University.

25.   The Rockefeller entities are a single entity.

26.   Rockefeller was founded in 1910, and it was originally called "The Rockefeller Institute Hospital." It was a part of the Rockefeller Institute for Medical Research, which was founded in 1901. From 1958 to 1965, the institution was called "The Rockefeller Institute," and it has been known by its present name, the Rockefeller University Hospital, since 1965.

27.   Rockefeller is a world-renowned research institute funded by federal grant money, philanthropic donations from prominent donors, royalties from patents, and by borrowing money on the public market through the issuance of

bonds.

28.    Rockefeller states on its website:

Patients and volunteers who consent to participate in research studies (protocols) are treated without charge. Unlike most hospitals, the Rockefeller University Hospital does not routinely provide standard diagnostic and treatment services. Admission is selective: patients are chosen by Hospital physicians solely because they have an illness or condition being studied, or because they are healthy volunteers and are also needed for study. Thus, all research participants are volunteers, and as such are important partners in the research process. Without volunteers and patients, significant advances in biomedical knowledge could not otherwise be achieved.[1]

## VI.    FACTUAL ALLEGATIONS

### A.    General Allegations Pertaining to Archibald

29.    In 1940, Rockefeller hired Archibald as a visiting research investigator and pediatric endocrinologist.

30.    Archibald would remain at Rockefeller, with limited exceptions, until at least 1982. He served as an assistant resident physician from 1941 through 1946. He returned to the Hospital as a senior physician and University professor in 1948, and remained until 1980 as a hospital-based physician. He continued to hold medical staff privileges at the Hospital until at least 1982 and served as a senior physician emeritus until at least 1987.

---

[1] Information for Patients and Research Volunteers, *available at*: https://rucares.org/info/.

31.    At all material times, Archibald worked for, was employed by, and acted as an agent, employee, and servant of Rockefeller under Rockefeller's direct supervision, management, agency, and control.

32.    In Defendant Rockefeller's words, "[] Archibald studied childhood growth and maturation, focusing on children of short stature."[2]

33.    Archibald was a preeminent pediatric endocrinologist. He was widely considered the top specialist in the northeast, if not the entire United States, for pediatric endocrinology.

34.    Defendant Rockefeller represented to the community and to patients that Archibald was safe, trustworthy, and of high moral and ethical repute. Implicitly and explicitly, Defendant Rockefeller represented that Archibald was not a sexual threat to his patients.

35.    Archibald's patients had no reason to suspect that Archibald was anything other than a competent and ethical physician under the employ of Rockefeller University Hospital.

36.    Archibald treated approximately 9,000 patients during his career with

--------------------

[2] Statement regarding Dr. Reginald Archibald from the Rockefeller University Hospital (October 5, 2018), *available at*: https://www.rucares.org/assets/file/October%205%202018%20Statement%20regarding%20Dr.%20Reginald%20Archibald.pdf

Rockefeller.

37.    The children who sought treatment from Archibald were undersized and were having trouble growing. They were already an especially vulnerable group of potential victims. In addition, they were too young to know the difference between a legitimate medical practice and molestation.

38.    For more than 40 years, Archibald sexually abused his patients.

39.    Archibald sexually abused both girls and boys.

40.    Archibald's victims were children. As minors, they were incapable of consenting to sexual contact.

41.    Archibald's victims also were unable to terminate the doctor–patient relationship they had with Defendants.

42.    Archibald would require his patients to remove all clothing during appointments.

43.    Archibald measured his male victims' penises, both flaccid and erect.

44.    Archibald would masturbate his victims or ask them to masturbate, sometimes to ejaculation. In some cases, he both asked his victims to masturbate and masturbated them.

45.    Archibald took nude and sexually explicit photographs of his patients, first with film, and later with a Polaroid camera.

46.   He would require his victims to stand fully nude against a wall and hold their palms out facing the camera.

47.   Archibald also took close-up photographs of his victims' genitals.

48.   Defendant Rockefeller is currently in possession of nude and pornographic photographs of Archibald's victims.

49.   The nude and pornographic photographs are not currently contained in the patient files of Archibald's victims.[3]  If they were contained in patient files at one time, then Rockefeller had contemporaneous access to the photographs.

50.   In at least one case, Archibald had a child's parent sign a release to permit photography of the child "for the advancement of medical science."

51.   At least two articles published by Archibald contain pictures of naked boys in the stance described by his victims.

52.   Archibald's abuse took place in his office and the examination rooms at Rockefeller's facilities.

---

[3] Defendant Rockefeller has acknowledged that "[f]astidiously maintaining" the "vital data" of its patients "is the responsibility" of Rockefeller. In this regard, Defendant Rockefeller has boasted that it "has every medical record on every patient ever seen at the hospital, saved on microfiche, microfilm, or in original hard copy." Collins, Terri, *Archiving Patient Research for More Than 94 Years*, The Rockefeller University Hospital Update (Fall 2004), 12, *available at*: https://docplayer.net/ 86508678-The-rockefeller-university-hospital-fall-hospital-five-year-gcrc-grant-re newed-susan-richer-mpa-fache.html.

53. Archibald used Defendant Rockefeller's equipment while abusing his victims.

54. Upon information and belief, other Rockefeller staff members were aware of Archibald's sexual abuse at the time he was abusing children.

55. Upon information and belief, Defendant Rockefeller was aware of the nude and pornographic photographs Archibald was taking of his victims while his victims were still patients of the Hospital.

56. Archibald carried out of all of these acts under the guise of "providing medical care" at Rockefeller University Hospital.

57. Archibald carried out these acts without fully explaining the "treatment" or obtaining informed consent from his patients.

58. Rockefeller had the authority and the ability to prevent Archibald from sexually abusing pediatric patients, and from taking nude and pornographic photographs of pediatric patients, throughout Archibald's career at Rockefeller.

59. Rockefeller failed to do so and affirmatively ignored Archibald's abusive behavior, allowing the abuse to occur and to continue unabated.

60. Upon information and belief, Rockefeller never suspended, warned, terminated, or otherwise disciplined Archibald for this heinous conduct.

61. Reasonably supervising Archibald and investigating him regarding his

abusive conduct and the nude photos he took would have prevented further abuse.

62.     Upon information and belief, this failure was a part of a conspiratorial plan and arrangement by Rockefeller and Archibald to conceal Archibald's wrongful acts, to avoid and inhibit detection, to block public disclosure, to avoid scandal and negative publicity, to avoid the disclosure of Rockefeller's tolerance of child sexual molestation and abuse, to preserve a false sense of propriety, and to avoid investigation and action by public authority including law enforcement.

63.     Such actions were motivated by a desire to protect the reputation and monetary support of Rockefeller, while fostering an environment where such abuse could continue to occur.

**B.     Rockefeller's Investigations of Archibald's Conduct**

64.     On October 5, 2018, Rockefeller issued a statement indicating that it had received reports in 2004 and 2018 from former patients of Archibald's that "related to the propriety of [] Archibald's conduct during physical examinations."

65.     Rockefeller retained a law firm, Debevoise & Plimpton LLP ("Debevoise") to investigate the allegations. "Following its review of then-available information, including from interviews with former patients, faculty, administrators, and staff, and two prior reports made in the 1990s that were located, Debevoise found certain allegations credible and determined that it was likely that some of []

11

Archibald's behavior towards [the reporting patient in 2004] was inappropriate."

66.    Debevoise was, at all times during the 2004 investigation, an agent of Defendant Rockefeller. It acted for Defendant Rockefeller's benefit and was subject to Defendant Rockefeller's control.

67.    Notably, Debevoise's investigation turned up two prior reports made during the 1990s. Rockefeller does not claim to have taken any action based on those prior reports.

68.    Upon information and belief, the "faculty, administrators, and staff" Debevoise interviewed were former colleagues of Archibald who had knowledge of his inappropriate conduct at or around the time it was occurring.

69.    In its October 5, 2018 Statement, Rockefeller also indicated that it had added a "policy relating to the further protection of pediatric patients" to "the Hospital's then-existing safeguards and processes designed to protect patients."

70.    However, Rockefeller did not explain what the newly added 2004 policy was, or what the previously existing "safeguards and processes designed to protect patients" were.

71.    After Debevoise's 2004 investigation, Defendant Rockefeller believed that allegations of Archibald's inappropriate conduct were credible.

72.    After Debevoise's 2004 investigation, Defendant Rockefeller had

reason to believe that Archibald's conduct was widespread and consistent across his victims.

73.     In its October 5, 2018 Statement, Defendant Rockefeller notes that in 2004 it "notified the Federal Office of Human Research Protections, the New York State Office of Professional Medical Conduct, and the Manhattan District Attorney."

74.     In 2004, however, Defendant Rockefeller did not notify potential victims so that they could offer additional, corroborating information to the District Attorney and testify against Archibald as part of a criminal prosecution.  Likewise, the victims could have sought, and then offered testimony at, a license revocation hearing before the New York State Office of Professional Medical Conduct.

75.     Upon information and belief, Defendant Rockefeller did not notify the United States Attorney's Office for the Southern District of New York.

76.     If it had notified the United States Attorney's Office, and the United States Attorney's Office had prosecuted (a then living) Archibald for child pornography, Archibald's victims could have sought restitution as a part of the prosecution. *See* 18 U.S.C. § 2259.

77.     Another former patient came forward in early 2018 and made a report that was similar to the report made in 2004.

78.     At that time, Rockefeller again engaged Debevoise to investigate.

13

79.     Debevoise was, at all times during the 2018 investigation, an agent of Defendant Rockefeller—and it remains an agent of Defendant Rockefeller currently. It acted—and continues to act—for Defendant Rockefeller's benefit and was subject to Defendant Rockefeller's control.

80.     "[S]everal former patients . . . came forward" as a part of Debevoise's 2018 investigation.

81.     As it had in 2004, Debevoise concluded that the reports were credible and that Archibald's conduct was "inappropriate."

82.     As the 2004 investigation did, Debevoise's 2018 investigation gave Defendant Rockefeller significant reason to believe that Archibald's conduct was widespread throughout his career, consistent with respect to his victims, and severely traumatic and damaging to his victims.

83.     Debevoise supplemented its investigation with a fuller report, which it published on or about May 23, 2019.[4]

84.     Debevoise's supplemental report noted that in 1961, the New York County District Attorney's Office presented issues relating to abuse by Dr.

---

[4] Debevoise's May 23, 2019 investigative report and findings are incorporated hereto by reference and *available at*:
https://archibaldreport.com/Report_on_the_Investigation_of_Dr._Reginald_Archib
ald.pdf.

Archibald to a grand jury, and "that the then-President of [Rockefeller] was made aware of the investigation."

85.    Debevoise reported that "[t]he physician-in-chief of the Hospital from 1960–1974 reported in 2004 that he had received several complaints, during his tenure, from patients, family members, or staff about Archibald's examinations of patients' genitals."

86.    Even the physician-in-chief "thought Archibald's approach to examinations, in taking measurements, was questionable."

87.    The physician-in-chief even asked Archibald about the complaints, and Archibald "became difficult and less communicative when asked."

88.    Apparently, no discipline or corrective measures of any kind were taken at that time. Had Rockefeller taken appropriate corrective action, decades of sexual abuse and child molestation could have been prevented.

**C.    Rockefeller's Letter to Former Patients of Archibald**

89.    In the fall of 2018, as a part of Debevoise's investigation into allegations concerning Archibald's conduct, Defendant Rockefeller sent the Letter to more than 1,000 former patients of Archibald.

90.    The Letter states:

Our records indicate that, some decades ago, you may have been a patient at The Rockefeller University Hospital and seen by [] Reginald

15

Archibald, who was at the Hospital from 1948–1982 and passed away in 2007. If we have contacted you in error, please disregard this letter.

Based on reports from several former patients regarding [] Archibald's interactions with them, we are reaching out to as many of his patients as we can locate. We have hired Helen Cantwell, of Debevoise & Plimpton LLP, to assist us with this outreach. If you have information you would like to share regarding your interactions with [] Archibald, please contact Helen at: (212) 909-6312 or hcantwell@debevoise.com.

Thank you for your consideration.

91.   Helen Cantwell is a lawyer—and a litigation partner—at Debevoise, which is a prominent international law firm. The Letter does not identify Ms. Cantwell as a lawyer, nor does it identify Debevoise as a law firm.

92.   The Letter does not indicate what use Rockefeller will make of the "information" that the Letter recipients might decide to "share regarding [their] interactions with [] Archibald."

93.   The Letter does not promise to preserve the confidentiality of any information former patients provide, nor does it indicate whether any information they provide will be segregated from future litigation materials, whether personal identifying information will be removed from their communications, or whether their communications may be used against them in future litigation.

94.   Anyone who received the Letter, and as a result took steps to identify Helen Cantwell or Debevoise, could have easily seen that she was an attorney and it was a law firm, and would have likely believed that an attorney–client relationship

16

existed between the recipient and Ms. Cantwell or her firm, despite the fact that no such relationship existed.

95.    Communications with possible victims of sexual abuse in other high-profile investigations have taken pains to preserve witness and victim confidentiality. Similarly, other investigations have carefully identified investigators as attorneys when they are attorneys.[5] The purpose of such disclosures is to prevent re-traumatization of victims. Other communications regarding mass sexual abuse have allowed victims to come forward on their own following public, non-targeted disclosures.

96.    At the time Rockefeller mailed the Letter to former patients of Archibald, New York's statute of limitations barred any claims against either the Estate or the Hospital.

97.    Upon information and belief, Rockefeller was aware that New York's statute of limitations barred any claims for sexual abuse against either the Estate or the Hospital.

98.    Upon information and belief, Rockefeller was aware that a substantial portion of the public is aware of the existence of various statute of limitations and

---

[5] *See* The Ohio State University, Office of Compliance and Integrity, *Strauss Investigation*, https://compliance.osu.edu/strauss-investigation.html.

that a substantial portion of the public—including Archibald's victims—would believe that abuse that occurred decades ago would be time barred.

99.    At the time Rockefeller mailed its Letter, it knew from publicly available news reports that the New York Legislature would likely take up for consideration, and likely pass, the Child Victims Act during its 2019 legislative session.

100.    Previous versions of the Child Victims Act from the 2018 session provided for a one-year window in which any plaintiff could file a lawsuit for claims of sexual abuse, irrespective of any other statute of limitations or whether the claims were previously barred. Rockefeller was aware that it was likely that any version of the Child Victims Act ultimately passed would include such a provision. In addition, even if the look-back provision was stripped from the statute, Defendant Rockefeller was aware that claims for many individuals under a certain age would remain under the new legislation.

101.    Upon information and belief, at least one purpose of Rockefeller's decision to send the Letter to more than a 1,000 former patients was to gather information about potential plaintiffs in advance of litigation.

102.    Because of its previous investigations, Rockefeller was aware that there was a substantial likelihood that it was sending the Letter to survivors of child sexual

18

abuse.

103.  Upon information and belief, Rockefeller knew that it was substantially likely that its Letter would cause a significant number of Archibald's former patients to suffer immediate, long-lasting, and severe emotional distress.

104.  Despite its awareness that it was sending its Letter to survivors of child sexual abuse and that its Letter would likely cause a significant number of the Letter's recipients to suffer severe emotional distress, Rockefeller sent the Letter anyway.

105.  Rockefeller's Letter did not comply with national best practices for investigating pervasive sexual abuse, especially pervasive childhood sexual abuse.

106.  Indeed, Rockefeller's Letter did not follow common sense as to how to reach out to victims of pervasive childhood sexual abuse.

107.  Many victims of Archibald's sexual abuse were reminded of the abuse they suffered, and therefore re-traumatized by Rockefeller's Letter.

108.  Many of the former patients who received the Letter learned of the possibility of other victims, for the first time, in the Letter.

109.  Additionally, Rockefeller did not "obtain an authorization for any use or disclosure of protected health information for marketing," and the Letter was not "a face-to-face communication or a promotional gift of nominal value." *See* 45

C.F.R. § 164.508(3)(i).

110.   The Letter was not sent pursuant to any current medical evaluation, diagnosis or treatment sought by its recipients.

111.   "Marketing" under the HIPAA Privacy Rule is defined as the making of "a communication about a product or service that encourages recipients of the communication to purchase or use the product or service." 45 C.F.R. § 164.501.

112.   The Letter was a communication about a service, namely Debevoise's investigation, which encouraged the Letter's recipients to use the firm's services.

### D.   P.N.'s Individual Allegations

113.   P.N. was born on November 7, 1955.

114.   As a child, he was perceived to be slight in stature.

115.   Although P.N. was generally a happy, popular, social and active child, he felt stress and insecurity regarding his height when other boys and girls were all growing faster.

116.   He was referred to Archibald because of his small stature in 1968.

117.   P.N. and his parents hoped that Archibald, a renowned endocrinologist, would solve the problem with his height through hormone therapy, which would require an appointment with Archibald every six months.

118.   P.N. was a patient at Rockefeller approximately from March 7, 1968 to

1972.

119.   He had at least 3 appointments with Archibald at Rockefeller University Hospital. Each involved traumatic sexual abuse.

120.   On his first appointment, P.N.'s mother took him to the appointment.

121.   On or about March 7, 1968, P.N.'s mother signed two consent forms. One stated: "I hereby consent that any routine treatment and diagnostic procedure, which may be deemed necessary, may be performed upon my son, [P.N.]. (The authorization includes physical examination, routine laboratory tests, routine X-rays, and administration of generally accepted medications.)" The other stated: "I hereby give permission for photographs of my child [P.N.] to be taken, only for medical and professional purposes."

122.   Archibald took Plaintiff alone to the examination room and locked the door behind him as they entered.

123.   An office desk was in the room. A wooden, straight-backed chair—the kind in a school classroom—sat next to it.

124.   After entering the room, Archibald directed P.N. to remove all of his clothing. He complied.

125.   Archibald directed P.N. to stand against the wall. P.N. complied.

126.   Archibald took numerous nude photographs of Plaintiff standing

against the wall.

127.   Archibald moved closer and took more photos of P.N.'s genitals.

128.   Archibald then directed P.N. to sit on the wooden, straight-backed chair, and he did so. He was still naked.

129.   Archibald falsely represented to P.N. that he needed to measure P.N.'s penis in both flaccid and erect state. He told P.N. that he needed to measure his penis so he could predict more accurately his future height and to determine what medical treatment would be required to augment it.

130.   Rockefeller's medical records for P.N. confirm that Archibald took measurements of P.N.'s penis several times.

131.   Archibald asked P.N. if he had ever become erect or ever ejaculated. He asked P.N. if he ever woke up with wet spots on the bed.

132.   Archibald then directed P.N. to become erect and to ejaculate. He directed P.N. to masturbate.

133.   Archibald falsely represented to Plaintiff that it was medically necessary, and integral to effective treatment, for Plaintiff to submit to the sexual abuse perpetrated by Archibald, when, in reality, the sole purpose of the abuse was Archibald's own sexual gratification.

134.   P.N. was twelve-and-a-half (12 ½) years old and nervous. He could not

achieve an erection.

135.   Archibald then reached over and took P.N.'s hand, and began to "help" P.N. masturbate himself.

136.   When that did not work, Archibald directed P.N. to sit on his lap, and Archibald continued to masturbate P.N.

137.   Yet, P.N. was still unable to become erect and ejaculate.

138.   Archibald became frustrated and upset with P.N.

139.   P.N. was terrified, humiliated, ashamed and confused.

140.   P.N. left, feeling very inadequate. He felt like there was something even more was wrong with him.

141.   Each examination lasted 30 to 60 minutes. Each masturbatory event seemed to last an eternity.

142.   Archibald carried out these acts without fully explaining the "treatment" or obtaining informed consent of Plaintiff or Plaintiff's parents.

143.   Archibald's acts were conducted under the guise of providing medical care at Rockefeller.

144.   The failure to give proper notice or to obtain consent for the purported "treatment" negated their objection to reject the "treatment."

145.   Archibald used his position of trust and confidence in an abusive

manner causing P.N. to suffer a variety of injuries including but not limited to shock, humiliation, emotional distress and related physical manifestations thereof, embarrassment, loss of self-esteem, disgrace, loss of enjoyment of life and negative impacts on his life.

146.   As a child with small stature, P.N. had felt such hope that Archibald the nationally renowned specialist could cure him; and instead after each visit, he felt a despair that he was failing.

147.   Instead of curing P.N., Archibald incorrectly and manipulatively diagnosed him with dwarfism.

148.   Additionally, Archibald manipulatively diagnosed P.N. with mild infantilism. In other words, he diagnosed P.N. as being physically "younger" than his chronological age.

149.   Upon information and belief, these diagnoses were calculated to ensure that P.N. would be required to return for follow-up and additional appointments.

150.   P.N. had not felt able to confide in anyone about the stress he felt over the situation. He kept these feelings inside him.

151.   P.N.'s later appointments with Archibald proceeded in the same way.

152.   After each appointment, he left feeling diminished and terrible.

153.   After his third or fourth appointment, the anxiety and fear of seeing

Archibald again was unbearable. He began to find excuses not to go to the appointments.

154. On September 22, 1971, Archibald sent P.N. a letter, informing him that Archibald felt "it would be well for you to return for a checkup."

155. Archibald also wrote a letter to P.N.'s father, telling him it would be "wise to have [P.N.] checked again even if he has since discontinued taking medication."

156. Following his appointments with Archibald, P.N. began to have trouble sleeping. He also began to eat irregularly.

157. P.N. suffered a consequent loss of confidence. He became withdrawn socially as a teenager; it was a stark change from the happy, popular, athletic young boy he was before his appointments with Archibald.

158. P.N. began to act out as a young teenager, and to behave in self-destructive ways very soon thereafter.

159. Though he was often withdrawn, the feelings of humiliation and confusion he suffered from would cause him to "act out" to try to impress people, particularly young women. The feelings of humiliation and confusion he suffered from because of Archibald's sexual abuse led him to experiment with cigarettes, alcohol, and illegal drugs by the age of 14 or 15.

160.   By age 14, P.N. was seeing a psychologist.

161.   At age 15, P.N. ran away from home, and ended up living in Colorado with an older sister who was in college there.

162.   P.N. continued to engage in self-destructive, risky, and dangerous behavior, like skiing out-of-bounds, jumping from cliffs with no safety equipment, and driving very fast and attempting dangerous jumps on motorcycles. He did so in a self-professed effort to impress those around him.

163.   In one incident, he nearly died climbing out of a 17th story window and walking on a ledge in New York City.

164.   He has suffered several concussions because of this behavior.

165.   Because he ran away following Archibald's sexual abuse, he finished high school two years late.

166.   He continued to experiment with drugs, including harder drugs like LSD. Eventually, P.N. developed a drug addiction and had to be checked into a drug rehab center.

167.   P.N. eventually was able to attend and graduate college at Stony Brook University in New York. He participated on the swimming and diving team.

168.   Yet, he never felt complete, secure, or happy.

169.   P.N. has had difficulty maintaining consistent employment throughout

his adult life.

170.   P.N. has difficulty beginning and maintaining serious, intimate relationships. He is divorced, and his longest relationship has only lasted a few years. Unsurprisingly, P.N. has a difficult time trusting anyone romantically.

171.   Additionally, intimate and sexual relationships are particularly difficult for P.N., because he suffers from severe anxiety and insecurity about his sexual performance abilities.

172.   He has been voluntarily celibate for fifteen years. His life seems easier without anyone romantically involved in it.

173.   As a result of the sexual abuse from Archibald, P.N. suffers from, and has been diagnosed with, depression, anxiety, and bipolar disorder.

174.   Additionally, as a result of Archibald's sexual abuse of him, P.N. has been diagnosed with post-traumatic stress disorder ("PTSD"), and suffers many distressing symptoms, including: intrusive memories; flashbacks and dissociative reactions; nightmares; isolation; psychological and physiological reactions from internal and external cues (triggers); avoidance of distressing memories, thoughts and feelings closely associated with the sexual abuse; negative alterations in mood and cognition, such as depression and negative beliefs and expectations about himself and others; feelings of detachment from others; persistent inability to

experience positive emotions; marked alterations in arousal and reactivity such as, irritable behavior and angry outbursts, hypervigilance and major sleep disturbance (*i.e.* inability to sleep more than 1-2 hours at a time, and at most 3-4 hours a night).

175.   As a result of Archibald's sexual abuse, P.N. also cannot trust doctors at all.

176.   He suffers from suicidal ideation. As an adult, he has contemplated suicide several times, including as recently as two years ago.

177.   Throughout his life, he has seen at least 15 therapists, psychiatrists, or mental health counselors.

178.   He has prescribed many different anti-depressants, anti-anxiety medications, and sleep medications. For a short time, he was put on bipolar medication.

179.   Each medication contains side effects that are in some ways as bad and crippling as his mental illness.

180.   Yet, no medication has been able to resolve his depression, his anxiety, his PTSD, his trouble sleeping, and his fear of intimacy with women and all other relationships.

181.   These afflictions have not taken away his vivid memories of being forced to undress and stand against the examination room wall to be photographed

by Archibald at the ages of 12 and 13. They have not erased the memories of Archibald fondling and masturbating him repeatedly.

182. Archibald's sexual abuse of P.N. robbed him of his childhood innocence.

183. P.N. experienced an intense feeling of dread at the thought of going back to see Archibald. This was not limited to the days leading up to his appointments; rather, P.N. endured this sense every single day until he was no longer in Archibald's "care."

184. P.N. continues to be haunted by the abuse that took place at Rockefeller University Hospital. His self-image, self-worth, personal relationships, and view of the world have all been shaped and impacted by the atrocious actions of Archibald and the lack of action from Defendants.

185. Upon information and belief, despite complaints to Rockefeller representatives, the concerns and allegations went unaddressed in violation of reporting policies and procedures and in a manner that was reckless, deliberately indifferent, and grossly negligent.

186. P.N. received the Letter from Rockefeller.

187. Plaintiff saw Rockefeller identified in the return address and immediately was concerned as to the substance of the communication.

188.   P.N. was immediately shocked by the Letter. His heart dropped when he saw Rockefeller in the return address and he was filled with a storm of emotions including anxiety and disbelief when he read the Letter's contents confirming that it was about Archibald.

189.   The Letter immediately brought Archibald's sexual abuse of P.N. to the forefront of his mind, and it forced P.N. to relive the encounter over, and over again.

190.   The Letter gave the immediate impression that Archibald may have sexually abused a significant number of children. Plaintiff had no idea that Archibald had molested other children before reading the Letter.

191.   It was infuriating for Plaintiff to realize that he had been part of a factory of abuse.

192.   P.N. was also keenly distressed because he has changed addresses several times in recent years. He therefore realized that this letter connecting him with Archibald's widespread sexually abusive and predatory behavior may have gone to incorrect addresses. Other people may have received other copies of his letter.

193.   As a result of receiving and reading Defendant Rockefeller's letter, P.N. was forced to recall his sexual abuse by Archibald, and he suffered and continues to suffer severe emotional distress.

194.   Rockefeller's sending of the Letter robbed P.N. of the right to process the issues stemming from Archibald's sexual abuse of him on his own timetable. P.N. was, and continues to be, infuriated by this fact.

195.   The Letter re-traumatized P.N. He was immensely stressed and went into another deep depression, eventually suffering several seizures and going into a coma that lasted three-and-a-half (3 ½) days as a result of the Letter.

196.   Following the seizures and coma, P.N. has been left with a partial short-term memory over the last several months.

197.   As a result of Rockefeller's letter, Plaintiff has and will continue to suffer extreme emotional distress.

198.   P.N. called the number identified in the Letter. He spoke with an individual named Alex Ginsburg.

199.   When he first called the number, P.N. believed that Mr. Ginsburg (and therefore Debevoise) was representing him.

200.   Mr. Ginsburg asked numerous leading questions.

201.   In response, P.N. told Mr. Ginsburg some details about the abuse. P.N. told him that Archibald took naked photos of him.

202.   Mr. Ginsburg continued to pry and attempt to persuade P.N. to provide even more details.

203.   P.N. was confused as to Debevoise's roll in this matter. In a subsequent phone call, P.N. began to ask Mr. Ginsburg for legal advice.

204.   At that point, Mr. Ginsburg finally—and for the first time—told him he could not give legal advice and informed P.N. that Debevoise was not representing him. Mr. Ginsburg finally revealed that he had a responsibility to represent the hospital.

205.   P.N. was shocked and outraged to learn that he had been lulled into revealing details about the repeated sexual abuse he suffered to Rockefeller's agent.

## V.   CAUSES OF ACTION

### COUNT I: SEXUAL ABUSE
### AGAINST DEFENDANT ESTATE

206.   Plaintiff re-alleges and incorporates by reference the allegations contained in all prior paragraphs as if fully stated in this Count.

207.   Archibald's inappropriate touching of Plaintiff would constitute a sexual offense as defined under New York Penal Code articles 130 and 263.

208.   Specifically, Archibald's conduct towards Plaintiff constitutes Forcible Touching under N.Y. Penal Code § 130.52, Sexual Abuse in the First Degree under N.Y. Penal Code § 130.65, and Use of a Child in a Sexual Performance under N.Y. Penal Code § 263.05.

209.   Plaintiff suffered damages as a result of Archibald's sexual abuse of

him, including bodily harm and severe emotional distress.

210.   As a direct and proximate result of the above-described conduct, Plaintiff has suffered and will continue to suffer great pain of mind and body, shock, emotional distress, permanent disability, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life; was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and earning capacity; and has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

211.   Plaintiff is therefore entitled to monetary relief, in the form of compensatory damages, to remedy the severe emotional distress suffered as a result of Archibald's intentional and outrageous conduct.

212.   The conduct of Archibald was intentional, extreme, and outrageous, entitling Plaintiff to an award of punitive damages.

## COUNT II: ASSAULT
## AGAINST DEFENDANT ESTATE

213.   Plaintiff re-alleges and incorporates by reference the allegations contained in all prior paragraphs as if fully stated in this Count.

214.   Archibald's inappropriate touching of P.N., and the apprehension it

created in him, would constitute a sexual offense as defined under New York Penal Code article 130.

215.   During Plaintiff's first appointment with Archibald, Archibald's physical conduct placed Plaintiff in imminent apprehension of harmful and offensive contact.

216.   As a result of Archibald's assault, Plaintiff suffered damages, including but not limited to severe emotional distress.

217.   As a direct and proximate result of the above-described conduct, Plaintiff has suffered and will continue to suffer great pain of mind and body, shock, emotional distress, permanent disability, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life; was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and earning capacity; and has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

218.   Plaintiff is therefore entitled to monetary relief, in the form of compensatory damages, to remedy the severe emotional distress suffered as a result of Archibald's intentional and outrageous conduct.

219.   The conduct of Archibald was intentional, extreme, and outrageous, entitling Plaintiff to an award of punitive damages.

## COUNT III: BATTERY
## AGAINST DEFENDANT ESTATE

220.   Plaintiff re-alleges and incorporates by reference the allegations contained in all prior paragraphs as if fully stated in this Count.

221.   Archibald's inappropriate touching and masturbating of Plaintiff would constitute a sexual offense as defined under New York Penal Code article 130.

222.   Archibald made physical, bodily contact with Plaintiff.

223.   Archibald's bodily contact with Plaintiff was harmful and offensive.

224.   Archibald intended to make physical contact with Plaintiff without his consent.

225.   Plaintiff did not consent to Archibald's harmful and offensive contact.

226.   As a result of Archibald's battery, Plaintiff suffered damages, including but not limited to bodily harm and severe emotional distress.

227.   As a direct and proximate result of the above-described conduct, Plaintiff has suffered and will continue to suffer great pain of mind and body, shock, emotional distress, permanent disability, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life; was prevented and will continue to be prevented from

performing daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and earning capacity; and has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

228.   Plaintiff is therefore entitled to monetary relief, in the form of compensatory damages, to remedy the severe emotional distress suffered as a result of Archibald's intentional and outrageous conduct.

229.   The conduct of Archibald was intentional, extreme, and outrageous, entitling Plaintiff to an award of punitive damages.

### COUNT IV: FRAUD
### AGAINST DEFENDANT ESTATE

230.   Plaintiff re-alleges and incorporates by reference the allegations contained in all prior paragraphs as if fully stated in this Count.

231.   Archibald falsely represented to Plaintiff that it was medically necessary, and integral to effective treatment, for Plaintiff to submit to the sexual abuse perpetrated by Archibald, when, in reality, the sole purpose of the abuse was Archibald's own sexual gratification.

232.   This false representation was material.

233.   Archibald knew this factual representation was false when he made it.

234.   Archibald intended Plaintiff to rely on his representation that the abuse

was medically necessary and integral to effective treatment, and he made it for the purpose that Plaintiff rely on it.

235.   Plaintiff did rely on Archibald's representation; he attempted to comply with Archibald's sexually abusive directives.

236.   His reliance was justifiable; Archibald was a doctor, an authority figure with a claim to knowledge.

237.   Archibald also made material omissions by not explaining that the treatment included sexually abusive contact, and nude and pornographic photography.

238.   Archibald had a duty, under New York law, to provide Plaintiff and his parents with informed consent, and to explain the medical treatment he would perform.

239.   Had Archibald explained what he intended to do as a part of the medical appointment, P.N. would have refused to come to the appointment, to enter the examination room with Archibald, or to consent to the "treatment."

240.   A reasonably prudent person in Plaintiff's position would not have undergone Archibald's "treatment" if they had been fully informed.

241.   As a proximate result of Archibald's fraudulent misrepresentation to Plaintiff, and of Plaintiff's justifiable reliance on Archibald's statement that the

sexual abuse by Archibald was medically necessary, Plaintiff suffered damages including but not limited to sexual abuse, bodily harm, and severe emotional distress.

242.   Archibald's inappropriate touching of Plaintiff would constitute a sexual offense as defined under New York Penal Code article 130, and his photography of Plaintiff would constitute Use of a Child in a Sexual Performance under N.Y. Penal Code § 263.05.

243.   As a direct and proximate result of the above-described conduct, Plaintiff has suffered and will continue to suffer great pain of mind and body, shock, emotional distress, permanent disability, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life; was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and earning capacity; and has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

244.   Plaintiff is therefore entitled to monetary relief, in the form of compensatory damages, to remedy the severe emotional distress suffered as a result of Archibald's intentional and outrageous conduct.

245. The conduct of Archibald was intentional, extreme, and outrageous, entitling Plaintiff to an award of punitive damages.

## COUNT V: FALSE IMPRISONMENT
## AGAINST DEFENDANT ESTATE

246. Plaintiff re-alleges and incorporates by reference the allegations contained in all prior paragraphs as if fully stated in this Count.

247. Archibald intended to confine Plaintiff in the examination room, which is a closed space.

248. Plaintiff felt confined in the room with Archibald.

249. Plaintiff did not consent to being confined by Archibald.

250. The confinement was not privileged.

251. During the confinement, Archibald touched Plaintiff in a manner that would constitute a sexual offense as defined under New York Penal Code article 130, and his photography of Plaintiff would constitute Use of a Child in a Sexual Performance under N.Y. Penal Code § 263.05.

252. Plaintiff suffered damages as a result of Archibald's unlawful confinement, including but not limited to severe emotional distress.

253. As a direct and proximate result of the above-described conduct, Plaintiff has suffered and will continue to suffer great pain of mind and body, shock, emotional distress, permanent disability, physical manifestations of emotional

distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life; was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and earning capacity; and has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

254.   Plaintiff is therefore entitled to monetary relief, in the form of compensatory damages, to remedy the severe emotional distress suffered as a result of Archibald's intentional and outrageous conduct.

255.   The conduct of Archibald was intentional, extreme, and outrageous, entitling Plaintiff to an award of punitive damages.

**COUNT VI:**
**NEGLIGENT HIRING, SUPERVISION, AND RETENTION**
**AGAINST DEFENDANT ROCKEFELLER**

256.   Plaintiff re-alleges and incorporates by reference the allegations contained in all prior paragraphs as if fully stated in this Count.

257.   Archibald was a hospital-based physician. Therefore, Archibald and Rockefeller were in an employer–employee relationship.

258.   As an employee of Rockefeller, Archibald was under the direct supervision, management, agency and control of Rockefeller at all material times during his interactions with Plaintiff.

259.   By awarding Archibald a position on its staff, Rockefeller represented to the community and to patients that Archibald was safe, trustworthy, and of high moral and ethical repute, such that parents and guardians felt they could entrust their children to his care.

260.   Implicitly and explicitly, Defendant Rockefeller represented that Archibald was not a sexual a sexual threat to patients of the Hospital.

261.   Archibald sexually abused a significant number of children in his office at the Hospital as well as in Hospital examination rooms and using Hospital equipment, including by taking nude photos of young children, including close-up photos of their genitalia.

262.   Archibald's inappropriate touching of Plaintiff would constitute a sexual offense as defined under New York Penal Code article 130.

263.   Archibald's publication of nude photos of young boys in two separate articles had no medical purpose and constituted child sexual abuse as well as pornography.

264.   At all times, Defendant Rockefeller had a duty to supervise Archibald, to investigate reports in appropriate behavior on Archibald's part, and to discipline him appropriately, including by terminating his employment, upon finding that he had performed the sexually abusive acts described above.

265. Hospital administrators, and other staff, who were available to be interviewed as a part of Debevoise 2004 investigation, which concluded that the allegations of child sexual abuse against Archibald were credible, knew of the child sexual abuse at or about the time it was occurring.

266. Indeed, Debevoise's May 23, 2019 supplemental report regarding Dr. Archibald's sexual abuse made clear that Rockefeller's physician-in-chief had received "several complaints," as least as early as 1960, which were serious enough to prompt an investigation even then. Dr. Archibald was troublingly "difficult and less communicative when asked about the complaints."

267. Yet, Rockefeller took no corrective action; it did not terminate or otherwise discipline Dr. Archibald.

268. Based on public reports, Archibald's child sexual abuse had been occurring unabated for years before he abused Plaintiff.

269. Rockefeller therefore knew or should have known of Archibald's propensity for the sexual abusive conduct that caused Plaintiff's injuries prior to his sexual abuse of Plaintiff.

270. Defendant Rockefeller never suspended, warned, terminated, or otherwise disciplined Archibald.

271. Defendant Rockefeller therefore failed to supervise Archibald and

failed to terminate his employment after learning of his sexual abuse of his child patients.

272.   As a direct and proximate result of the above-described conduct, Plaintiff has suffered and will continue to suffer great pain of mind and body, shock, emotional distress, permanent disability, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life; was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and earning capacity; and has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

273.   Plaintiff is therefore entitled to monetary relief, in the form of compensatory damages, to remedy the severe emotional distress suffered as a result of Defendant Rockefeller's outrageous conduct.

274.   The conduct of Defendant Rockefeller was both reckless and outrageous, entitling Plaintiff to an award of punitive damages.

## COUNT VII: VICARIOUS LIABILITY
## AGAINST DEFENDANT ROCKEFELLER

275.   Plaintiff re-alleges and incorporates by reference the allegations contained in all prior paragraphs as if fully stated in this Count.

276.   Archibald was a hospital-based physician. Therefore, Archibald and Rockefeller were in an employer–employee relationship.

277.   Archibald was acting within the scope of his employment in meeting with patients of the Hospital for treatment.

278.   Defendant Rockefeller is vicariously liable for the tortious conduct Archibald committed.

279.   Archibald's inappropriate touching of Plaintiff would constitute a sexual offense as defined under New York Penal Code article 130.

280.   As a direct and proximate result of the above-described conduct, Plaintiff has suffered and will continue to suffer great pain of mind and body, shock, emotional distress, permanent disability, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life; was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and earning capacity; and has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

281.   Plaintiff is therefore entitled to monetary relief, in the form of compensatory and punitive damages, to remedy the bodily harm and severe

emotional distress suffered as a result of Archibald's extreme and outrageous conduct for which Rockefeller is vicariously liable.

## COUNT VIII:
## GROSS NEGLIGENCE
## AND/OR WANTON AND RECKLESS MISCONDUCT
## AGAINST DEFENDANTS ESTATE AND ROCKEFELLER

282.   Plaintiff re-alleges and incorporates by reference the allegations contained in all prior paragraphs as if fully stated in this Count.

283.   Defendant Rockefeller owed Plaintiff a duty to use care to ensure his safety and freedom from sexual assault, harassment, abuse, and molestation while interacting with their employees, representatives, and/or agents, including Archibald.

284.   Archibald owed Plaintiff a duty of reasonable care in carrying out his duties in a reasonably safe manner as an employee, agent, and/or representative of Defendant Rockefeller.

285.   By seeking medical treatment from Archibald in the course of his employment, agency, and/or representation of Defendant Rockefeller, a special, confidential, and fiduciary relationship between Plaintiff and Archibald was created, resulting in Archibald owing Plaintiff a duty to use due care.

286.   Defendant   Rockefeller's   failure   to   adequately   supervise Archibald—especially once it knew or should have known of his nonconsensual

sexual abuse and nude and pornographic photography during examinations—was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff.

287.  Archibald's conduct towards Plaintiff constitutes Forcible Touching under N.Y. Penal Code § 130.52, Sexual Abuse in the First Degree under N.Y. Penal Code § 130.65, and Use of a Child in a Sexual Performance under N.Y. Penal Code § 263.05.

288.  Defendant Rockefeller's conduct demonstrated a willful disregard for precautions to ensure Plaintiff's safety.

289.  Defendant Rockefeller breached the duty owed to Plaintiff and was grossly negligent when it conducted itself by the actions described above, said acts having been committed with reckless disregard for Plaintiff's health and safety, and with a substantial lack of concern as to whether an injury would result.

290.  As a direct and proximate result of the above-described conduct, Plaintiff has suffered and will continue to suffer great pain of mind and body, shock, emotional distress, permanent disability, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life; was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; has sustained

and will continue to sustain loss of earnings and earning capacity; and has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

291.   Plaintiff is therefore entitled to monetary relief, in the form of compensatory damages, to remedy the severe emotional distress suffered as a result of Defendant Archibald's and Defendant Rockefeller's outrageous conduct.

292.   The conduct of Archibald was intentional, extreme, and outrageous, and the conduct of Defendant Rockefeller was reckless, extreme, and outrageous, entitling Plaintiff to an award of punitive damages.

**COUNT IX:**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**AGAINST DEFENDANT ROCKEFELLER**

293.   Plaintiff re-alleges and incorporates by reference the allegations contained in all prior paragraphs as if fully stated in this Count.

294.   Defendant Rockefeller's conduct in sending the Letter to victims of sexual abuse who, at the time they received the Letter, believed they had no legal recourse for the sexual abuse they endured, was extreme and outrageous.

295.   Defendant Rockefeller was reckless and disregarded a substantial probability that the Letter would cause severe emotional distress by reopening the wounds of the victims of Archibald's sexual abuse.

296.   Defendant Rockefeller's conduct in sending the Letter in fact caused,

and was the proximate cause of, severe emotional distress, trauma, and mental anguish.

297.   Plaintiff suffered severe emotional distress when he read Defendant Rockefeller's Letter.

298.   Defendant Rockefeller's Letter forced Plaintiff to relive the sexual abuse he suffered at the hands of Archibald.

299.   Rockefeller's Letter caused Plaintiff to suffer several seizures, resulting in a coma.

300.   As a direct and proximate result of the above-described conduct, Plaintiff has suffered and will continue to suffer great pain of mind and body, shock, emotional distress, permanent disability, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life; was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and earning capacity; and has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

301.   Plaintiff is entitled to monetary relief, in the form of compensatory damages, to remedy the severe emotional distress suffered because of Defendant

Rockefeller's outrageous conduct.

302.   The conduct of Defendant Rockefeller was both reckless and outrageous, entitling Plaintiff to an award of punitive damages.

**COUNT X:**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**AGAINST DEFENDANT ROCKEFELLER**

303.   Plaintiff re-alleges and incorporates by reference the allegations contained in all prior paragraphs as if fully stated in this Count.

304.   Rockefeller University had a duty to avoid causing the recipients of its Letter to suffer emotional distress and to avoid re-traumatizing victims of child sexual abuse by forcing them to relive their abuse when reading the Letter.

305.   The recipients of Defendant Rockefeller's Letter were former patients of the Hospital, whom it had reason to believe were former patients and possible victims of Archibald.

306.   It was thus apparent that there was an especial likelihood that the Letter would cause a significant portion of the recipients to suffer genuine and serious mental anguish and emotional distress.

307.   Additionally, Defendant Rockefeller did not obtain an authorization from former patients of Archibald for any use or disclosure of protected health information for marketing, and had a duty not to contact them for marketing purpose

49

without obtaining authorization.

308. Rockefeller acted unreasonably and breached its duty by sending the Letter.

309. Receipt of the Letter in fact caused and was the proximate cause of severe emotional distress, trauma, and mental anguish.

310. As a direct and proximate result of the above-described conduct, Plaintiff has suffered and will continue to suffer great pain of mind and body, shock, emotional distress, permanent disability, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life; was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and earning capacity; and has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

311. Plaintiff is entitled to monetary relief, in the form of compensatory damages, to remedy the severe emotional distress they suffered because of Defendant Rockefeller's outrageous conduct.

312. The conduct of Defendant Rockefeller was both reckless and outrageous, entitling Plaintiff to an award of punitive damages.

## COUNT XI:
## INTRUSION UPON SECLUSION
## AGAINST DEFENDANT ROCKEFELLER

313.   Plaintiff re-alleges and incorporates by reference the allegations contained in all prior paragraphs as if fully stated in this Count.

314.   Defendant Rockefeller intentionally sent a Letter to Plaintiff.

315.   The Letter was received in Plaintiff's private quarters.

316.   Through its Letter, Rockefeller intruded upon the solitude, seclusion, and private affairs and concerns of Plaintiff.

317.   When it sent the Letter to Plaintiff, Defendant Rockefeller knew there was substantial likelihood that Plaintiff had been sexually abused by Archibald, and that the Letter could re-traumatize Plaintiff, causing severe emotional distress.

318.   Accordingly, Defendant Rockefeller University Hospital's intrusion by sending the Letter to Plaintiff is highly offensive.

319.   As a direct and proximate result of the above-described conduct, Plaintiff has suffered and will continue to suffer great pain of mind and body, shock, emotional distress, permanent disability, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life; was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and earning capacity; and has incurred

51

and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

320.  Plaintiff is entitled to monetary relief, in the form of compensatory damages, to remedy the severe emotional distress they suffered because of Defendant's outrageous conduct.

321.  The conduct of Defendant Rockefeller was both reckless and outrageous, entitling Plaintiff to an award of punitive damages.

## RELIEF REQUESTED

WHEREFORE, Plaintiff requests that judgment be entered against Defendants, ordering:

a.  Defendants be enjoined from further violations of Plaintiff's rights;

b.  Plaintiff be awarded compensatory, punitive, and exemplary damages for past and future pain and suffering and past and future emotional distress and mental anguish;

c.  Defendants pay for the costs of future counseling, therapy, and medical treatment related to the injuries described above;

d.  Plaintiff be awarded pre-judgment and post-judgment interest;

e.  Defendants pay Plaintiff's reasonable costs and attorneys' fees; and

f.  All other relief the court deems necessary and equitable.

## JURY DEMAND

A trial by jury is hereby demanded.

Dated: November 12, 2019.

**LEVY KONIGSBERG, LLP**

By: /S/ COREY M. STERN
Corey M. Stern
*cstern@levylaw.com*
Renner K. Walker
*rwalker@levylaw.com*
800 Third Ave., 11th Floor
New York, NY 10022
Phone:   (212) 605-6200
Fax:   (212) 605-6290

*Attorneys for the Plaintiff*